Rodney VLOTHO, Appellant,

v.

HARDIN COUNTY, Hardin County Board of Supervisors, Donald Balvanz and Linn Adams, Appellees.

No. 92–1183.

Supreme Court of Iowa.

Nov. 24, 1993.

As Amended on Denial of Rehearing Dec. 21, 1993.

Rand S. Wonio of Lane and Waterman, Davenport, for appellant.

Carlton G. Salmons of Austin, Gaudineer, Austin, Salmons & Swanson, Des Moines, for all appellees; John P. Whitesell of Whitesell Law Office, Iowa Falls, for appellee Hardin County (cross-appeal).

Considered by HARRIS, P.J., and CARTER, LAVORATO, SNELL, and TERNUS, JJ.

LAVORATO, Justice.

This case is about a bridge with historical significance that a county engineer tore down, allegedly without authority from the county board of supervisors. The board fired the engineer because of his actions. He, in turn, sued the county and two members of the board of supervisors for wrongful termination and defamation. The county responded with a counterclaim for damages it allegedly sustained when the bridge was torn down. Following a bench trial, the district court found against the engineer on his claims and found for the county on its claim.

The engineer appealed, contending that the district court erred in (1) refusing to set aside a default for his failure to timely reply to the county's counterclaim, (2) finding he was not entitled to indemnification, and (3) awarding damages to the county based on replacement costs. The county cross-appealed, contending that the court erred in not awarding (1) punitive damages, and (2) damages based on the bridge's aesthetic and historical significance value.

We reverse on the indemnification issue and remand to allow the district court to determine whether the engineer is entitled to indemnification on the basis that his actions in tearing down the bridge were within the scope of his employment. We affirm on the other issues raised in the appeal. We affirm on the cross-appeal.

I. *Background Facts and Proceedings.*

Rodney Vlotho was the Hardin County engineer from 1977 until the county terminated his employment in February 1990. His duties included overseeing construction and maintenance of the roads and bridges in the county. Over a twelve year period, Vlotho's department had replaced approximately eight to nine bridges per year.

In November 1989 county personnel, acting pursuant to a directive from Vlotho, tore down the Eagle City Bridge. This bowstring bridge was built in the 1870s. It was made of wrought and cast iron. Few remain in existence in Iowa.

Since 1983 the bridge had been open only to pedestrian traffic. That year a new bridge was built to replace it. The county obtained state and federal funding to build the new bridge. The county obtained these funds on the written condition that the county would preserve and maintain the Eagle City Bridge as a foot bridge. Vlotho signed written correspondence to that effect on behalf of the county.

When Vlotho gave the demolition crew their instructions to tear down the old bridge, he told them to keep the bridge's destruction quiet. Once the public learned about the bridge's fate, there was a fire storm of controversy. A number of citizens appeared at board meetings to express their displeasure. It was at one of these meetings the two Hardin County supervisors allegedly made statements that formed the basis of Vlotho's defamation claim.

The board terminated Vlotho's employment on February 1, 1990. The board notified Vlotho of the termination by letter in which it gave three reasons for its action: (1) his failure to follow past practices and procedures in demolishing the Eagle City Bridge, (2) his order to demolish the bridge without prior authorization from the board, and (3) his violation of the agreement with state and federal authorities to preserve and maintain the bridge as a walking bridge for the public.

The termination prompted Vlotho to sue the county, its board of supervisors, and the two board members. In the suit Vlotho alleged his discharge was wrongful and his character was defamed.

The county counterclaimed, seeking damages from Vlotho for the old bridge's destruction. The county alleged that Vlotho

had acted outside his authority when he ordered the bridge demolished.

Vlotho did not reply to the counterclaim within the time allowed. That prompted the county to secure a default from the clerk of district court. The district court denied Vlotho's motion to set aside the default, and this court denied Vlotho's application for interlocutory appeal from that ruling.

The bench trial, posttrial motions and rulings on them, this appeal, and cross-appeal followed.

As we discuss the issues raised, we recite additional facts relevant to those issues.

## II. *The Default Issue.*

On December 7, 1990, the county filed its answer and counterclaim. Vlotho's reply to the counterclaim was due by December 27. Vlotho's attorney did not file this reply until January 4, 1991, about a week late. In the meantime, the county had the clerk enter a default on the counterclaim on December 31, four days after the reply was due. The district court refused to set aside the default. For reasons that follow we hold that the clerk had no jurisdiction to enter the default. The default was therefore void and without effect.

Iowa Rule of Civil Procedure 85 governs time to move or plead. Rule 85(b) requires a plaintiff to "serve a reply to a counterclaim in the answer within twenty days after service of the answer."

Iowa Rule of Civil Procedure 230 defines defaults, and Iowa Rule of Civil Procedure 231 governs how defaults are entered. They pertinently provide:

### Rule 230. Default Defined

A party shall be in default whenever that party: (a) fails to serve, and within a reasonable time thereafter file, a motion or answer as required in R.C.P. 53 or 54, or, has appeared, without thereafter serving any motion or pleading as stated in R.C.P. 87. . . .

### Rule 231. How Entered

*If a party* not under legal disability or not a prisoner in a reformatory or peniten-tiary *is in default under R.C.P. 230(a), the clerk, on demand of the adverse party, must forthwith enter such default of record without any order of court. All other defaults shall be entered by the court.*

■ Plainly, according to Rule 231, the only defaults the clerk has authority to enter are those listed in Rule 230(a). Rule 85(b), which governs the time limit for replies to counterclaims, is not mentioned in Rule 230(a). Consequently, the clerk has no jurisdiction to enter defaults on counterclaims. Counterclaim defaults are covered by the catch-all language at the end of Rule 231: "All other defaults shall be entered by the court." Here only the district court could have entered the default. Our court of appeals, using similar reasoning, reached the same conclusion in *Croell Redi Mix, Inc. v. Schwickerath,* 423 N.W.2d 898, 900 (Iowa App.1988).

At trial the district court allowed Vlotho to contest the allegations of the counterclaim despite the default. The trial judge wisely recognized in his findings that the "default may be void or voidable because it was entered by the clerk." The default therefore had no effect on the outcome of the suit. However, we feel compelled to address the issue because even at this late date the county is still insisting that the default was good. If the county were right, that would mean—as the county argues—that all of the allegations of the counterclaim would be deemed admitted.

In this connection we need to mention that attorney John P. Whitesell, one of the attorneys for the county, came into the case after the default had been entered and after the district court had refused to set it aside. Whitesell disavows any participation in securing the default and any participation in that part of the county's brief urging this court to uphold the default. Whitesell's representation of the county here was limited to the cross-appeal which dealt with damages only.

We would be remiss in our duty to the public, bench, and bar if we were to ignore the manner in which this default was taken.

Standards of civility exist in the practice, not as a matter of convenience to the profession, but as a matter of fairness and simple justice. These standards condemn unfair tactics, such as "blind siding" counsel of record with an ex parte application for default. Departure from the standards of civility are obvious examples of ineffective and counterproductive advocacy. Such departures are condemned because they severely distract from the quality of justice Iowa citizens have a right to expect when they come to court.

Interestingly, the Committee on Civility of the Seventh Federal Judicial Circuit has addressed this problem in its "Proposed Standards For Professional Conduct Within the Seventh Judicial Circuit." One of its proposed standards addressing conduct among lawyers provides:

> We will not cause any default or dismissal to be entered without first notifying opposing counsel, when we know his or her identity.

Marvin E. Aspen, *The Judiciary—New Issues and New Visions,* 40 Fed.B.News & J. 496, 499 (1993).

### III. *The Indemnification Issue.*

As the district court concluded, the indemnification issue arises out of the county's counterclaim. In essence, by its counterclaim, the county seeks damages from Vlotho for his alleged unauthorized removal of the bridge. Iowa Code section 613A.8 requires the county to defend, save harmless, and indemnify its employees against any tort claim "arising out of an alleged act or omission occurring within the scope of their employment or duties." The district court found that in removing the bridge "Vlotho was acting outside the performance of official duties." For this reason, the court denied Vlotho's claim for indemnification.

■ Unless otherwise provided by statute, an employee is liable in damages to the employer for the employee's negligence or wrongful act resulting in loss to the employer. 30 C.J.S. *Employer–Employee* § 129, at 201 (1992). Iowa Code section 613A.8 abrogates this rule under certain circumstances.

■ Iowa Code section 613A.8 pertinently provides:

> *The governing body* [includes county board of supervisors pursuant to Iowa Code section 613A.1(2)] *shall defend its officers* and *employees,* whether elected or appointed and *shall save harmless and indemnify the* officers and *employees against any tort claim* or demand, whether groundless or otherwise, *arising out of an alleged act or omission occurring within the scope of their employment or duties.*

The italicized language makes clear that a county must (1) defend, save harmless, and indemnify an employee, (2) against any tort, (3) arising out of an alleged act or omission, (4) occurring within the scope of the employee's employment or duties.

The obligation to indemnify means the county's right to recover damages because of the agent's actions is eliminated when the employee's tort occurs within the scope of the employee's employment or duties. *St. Paul Ins. Cos. v. Horace Mann Ins. Co.,* 231 N.W.2d 619, 625 (Iowa 1975). Such an obligation is akin to a contract for indemnity against the consequences of one's own negligence. A prime example of such a contract is an automobile liability insurance policy. Conversely, if the tort arises out of an act or omission outside the scope of the employee's employment or duties, the county still retains its right to recover against the employee for damages resulting from the act or omission.

A. *Act or omission occurring within the scope of their ... duties.* The district court's finding that Vlotho was acting "outside the performance of official duties" focused on the "duties" prong of the "act or omission occurring within the scope of their employment or duties" language in section 613A.8. Implicit in the district court's finding is the fact that part of Vlotho's official duties included maintaining and preserving the bridge, and when he tore it down, Vlotho breached or exceeded those duties. There is substantial evidence in the record to support the district court's ultimate finding that Vlotho was acting outside the performance of official duties and the implicit findings we have just mentioned.

For example, Vlotho, on behalf of the county, agreed with state and federal authorities

to maintain and preserve the bridge as a walking bridge for historical purposes. So part of his official duties was to maintain and preserve the bridge. As the district court found, Vlotho did exactly the opposite. First, he failed to make necessary maintenance and repairs to preserve the bridge.

Second, when he did order the bridge removed, Vlotho refrained from obtaining the board's permission, although he knew about the prior agreements with state and federal officials.

Third, two days before the bridge was demolished, Vlotho and the board made their annual inspection of bridges, and Vlotho made no mention of his intentions. In the past as part of this inspection, Vlotho would receive directions from the board as to which bridges should be demolished.

Last, Vlotho ordered county employees to demolish the bridge in secrecy. In doing so, he told one employee that he—Vlotho—could handle any anticipated public disapproval. The district court viewed this as an indication that Vlotho was aware that he was acting outside his authority.

However, our analysis does not end here.

■ B. *Act or omission occurring within the scope of their employment.* The district court made no finding that Vlotho's actions and omissions were outside the scope of his employment. This is the other prong of the "act or omission occurring within the scope of their employment or duties" language in section 613A.8.

One authority explains scope of employment this way:

[Scope of employment] is obviously no more than a bare formula to cover the unordered and unauthorized acts of the servant for which it is found to be expedient to charge the master with liability, as well as to exclude other acts for which it is not. It refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment.

[M]any factors enter into the question: the time, place and purpose of the act, and its similarity to what is authorized; whether it is one commonly done by such servants; the extent of departure from normal methods; the previous relations between the parties; whether the master had reason to expect that such an act would be done. . . . It has been said that in general the servant's conduct is within the scope of his employment if it is of the kind which he is employed to perform, occurs substantially within the authorized limits of time and space, and is actuated, at least in part, by a purpose to serve the master. . . .

The fact that the servant's act is expressly forbidden by the master, or is done in a manner which he has prohibited, is to be considered in determining what the servant has been hired to do, but it is usually not conclusive, and does not in itself prevent the act from being within the scope of employment.

W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 70, at 502 (5th ed. 1984); *see also,* Restatement (Second) of Agency §§ 228 (Scope of Employment), 229 (Kind of Conduct Within Scope of Employment), 230 (Forbidden Acts); *Sandman v. Hagan,* 261 Iowa 560, 567, 154 N.W.2d 113, 117 (1967) (act to be within scope of employment must be of same general nature as that authorized or incidental to the conduct authorized); *Rosenstein v. Bernhard & Turner Auto. Co.,* 192 Iowa 405, 408–10, 180 N.W. 282, 283 (1920) (master who clothes agent with authority to do a named thing is liable for whatever agent does which is incident to the performance of that thing, irrespective of the instructions of the master); *Lewis v. Schultz,* 98 Iowa 341, 344–46, 67 N.W. 266, 267 (1896) (master is liable for wrongful act of his servant, performed within the scope of the employment, even though in the performance of specific wrongful act, the servant disobeys the instructions of the master).

Applying these principles here, we think the evidence generated a fact question on whether Vlotho's actions in tearing down the bridge were within the scope of his employment. Iowa Code section 309.21 describes the duties of a county engineer:

All construction and maintenance work shall be performed under the direct and immediate supervision of the county engineer who shall be deemed responsible for the efficient, economical and good faith performance of said work.

Vlotho's job description dovetails with section 309.21. The description states in part: "Under administrative direction, is responsible for planning, coordinating, and supervising the construction, maintenance, and engineering projects of the county secondary road system."

Vlotho testified that under section 309.21 he felt it was his job to take care of dangerous situations and he felt the bridge should be removed because it was dangerous. Photographs and other testimony tend to support Vlotho's opinion that the bridge was dangerous.

Additionally, the evidence reveals that Vlotho's county crew replaced eight to nine bridges per year during Vlotho's employment, including an historical bridge similar to the one in question. Vlotho points to his termination letter which says nothing about his actions being outside the scope of his employment. Rather, the county's objections concerned the way he carried out his duties, which was contrary to past practices, without prior board approval, and contrary to an agreement with state and federal authorities.

Based on this evidence, the district court could find that part of Vlotho's duties included tearing down bridges. So what he did was what he was employed to do, albeit that in this instance what he did was contrary to the wishes of the county. Such findings could lead the district court to find ultimately that Vlotho's actions—though unauthorized—were within the scope of his employment.

On the other hand, the court could find from the evidence—as it did—that Vlotho exceeded his authority, departed substantially from past practices, and caused the county to be in breach of agreements with state and federal authorities to preserve and maintain the bridge. The record would also support a finding that the county had no reason to foresee what ultimately happened. Given all these facts—in addition to the fact that the bridge was demolished under stealth—the court could find that Vlotho's actions were not intended to advance the interests of the county. In combination, these facts could lead the district court to find ultimately that Vlotho's actions fell outside the scope of his employment.

In any event, the question of whether an act is within the scope of employment is generally a fact question. *Sandman,* 261 Iowa at 569, 154 N.W.2d at 118. Because we think there is an unresolved fact question on whether Vlotho was acting within the scope of his employment, we reverse and remand to allow the district court to make a finding on this issue.

## IV. *The Punitive Damages Issue.*

■ This issue is closely tied to the indemnification issue. In its cross-appeal, the county complains because the district court did not award it punitive damages against Vlotho.

In denying punitive damages, the district court relied on the definition of punitive damages in the Restatement (Second) of Torts, section 908 (1979). This definition provides in part:

(1) Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.

(2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's *evil motive or his reckless indifference to the rights of others . . . .*

(Emphasis added.)

Significantly, the district court expressly found that "Vlotho's decision to remove the [bridge] was not generated by an evil motive or *reckless indifference to the rights of others.*" (Emphasis added.) Rather, the decision, the court found, was the result of Vlotho's "assumption that was incorrect." Contrary to this assumption, Vlotho's "decision to remove the bridge," the court said, "was not authorized by the board and it violated an agreement to preserve the bridge."

The county thinks the district court erred when it used the "evil motive or reckless indifference" standard in the Restatement definition of punitive damages. The correct standard, the county says, is "the willful and wanton disregard for the rights or safety of another" standard in Iowa Code section 668A.1(1)(a). The county strenuously argues that the Restatement standard is harder to prove than the one in section 668A.1(1)(a). For reasons that follow, we disagree and conclude the district court applied the right standard.

Preliminarily, we note that Iowa Code section 613A.8—the indemnification statute—expressly states that "the duty to save harmless and indemnify does not apply to awards for punitive damages."

Iowa Code chapter 668A codifies Iowa law on punitive damages. Iowa Code section 668A.1(1)(a) directs the district court to make findings in a bench trial involving a claim for punitive damages indicating

> [w]hether, by a preponderance of clear, convincing, and satisfactory evidence, the conduct of the defendant from which the claim arose constituted *willful and wanton disregard for the rights* or safety *of another.*

(Emphasis added.)

Recently, in explaining what willful and wanton in section 668A.1(1)(a) means, we adopted this definition:

> The actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences.

*Fell v. Kewanee Farm Equip. Co.,* 457 N.W.2d 911, 919 (Iowa 1990) (quoting W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 34, at 213 (5th ed. 1984)).

The above definition has been said to apply to conduct that is "willful," "wanton," or "reckless." That is to say, courts have treated the three terms to mean the same thing in a legal context. *Prosser & Keeton on the Law of Torts* § 34, at 212–13.

Support for this conclusion appears in the Restatement (Second) of Torts itself. Comment b to section 908 talks about the character of the defendant's conduct. The comment makes this significant statement: "Reckless indifference to the rights of others and conscious action in deliberate disregard of them (see section 500) may provide the necessary state of mind to justify punitive damages." Section 500, referred to in comment b, is entitled "Reckless Disregard of Safety Defined." The definition in section 500 is consistent with the definition of willful and wanton we adopted in *Fell v. Kewanee* from *Prosser & Keeton on the Law of Torts.* Comment c to section 501 (Liability for Conduct in Reckless Disregard of Another's Safety) of the Restatement (Second) of Torts recognizes that

> [i]nasmuch as the conduct which is defined as in reckless disregard of safety in section 500 is often described as "wanton or willful" misconduct, the definition of such conduct in [section 500] may be of importance in determining the actor's liability under a statute which imposes liability upon those whose conduct is "wanton or willful."

So here the reckless indifference the district court was talking about falls within the meaning of willful and wanton in section 668A.1(1)(a). Our review of the record leads us to conclude that there was an issue of fact on whether Vlotho's conduct in demolishing the bridge constituted reckless indifference to the county's rights and conscious action in deliberate disregard of them. As the district court noted, the issue was a "close question." But we cannot say that the county carried its burden here to show as a matter of law that such conduct reached the level of reckless indifference or in the words of the statute, "willful and wanton disregard" of the county's rights.

## V. The Compensatory Damages Issues.

In his appeal Vlotho maintains the district court erred in awarding bridge replacement cost damages to the county. He argues the county failed to produce evidence on the elements constituting the measure of damages for the total destruction of a bridge. The critical element Vlotho refers to is the

value of the bridge immediately before its destruction.

In contrast, the county responds arguing that not only is there sufficient evidence to establish its compensatory damages but the court erred in not awarding it "aesthetic and historical significance" value. The county raises the alleged error about aesthetic and historical significance value in its cross-appeal.

Because Vlotho's and the county's contentions are related, we discuss both in this division.

A. *Proper measure of damages for a destroyed bridge.* In *State v. Urbanek*, 177 N.W.2d 14 (Iowa 1970), this court stated the proper measure of damages for a bridge partially or totally destroyed:

> The general rule in Iowa for repairs or for replacement is the fair and reasonable cost of replacement or repair, but not to exceed the value of the property immediately prior to the loss or damage. *Had the bridge been totally destroyed, the limitation of recovery would be the fair and reasonable market value, and if no market value could be established, the actual or real value.*

*Id.* at 16–17; *accord Schiltz v. Cullen–Schiltz & Assoc., Inc.,* 228 N.W.2d 10, 18 (Iowa 1975). In short, if a bridge totally destroyed has no market value before its destruction, then the measure of damages is actual or real value.

■ Damages for the destruction of a public structure like a bridge cannot be determined by a reference to market value. That is because a destroyed bridge has no market value in the sense that a willing buyer or willing seller, even hypothetically, can be imagined. *Town of Fifield v. State Farm Mut. Auto Ins. Co.,* 119 Wis.2d 220, 225–27, 349 N.W.2d 684, 687 (1984). As one court put it, any attempt to apply a market value approach to property in the public domain like bridges "would be wholly speculative, the very pitfall to be avoided in proof of damages." *Commonwealth v. Estate of Crea,* 92 Pa.Commw. 242, 252, 483 A.2d 996, 1001 (1977).

Value to the owner is the ultimate standard of value to the plaintiff in a particular case. Market value is only a method of arriving at that value. The reason market value is the usual standard is because with most property one can make a loss good by going into the open market and buying an equivalent substitute. *Town of Fifield,* 119 Wis.2d at 227–29, 349 N.W.2d at 688. When that cannot be done, the courts usually resort to the actual or real value approach to establish value to the owner. *Urbanek,* 177 N.W.2d at 18. Relevant evidence to prove actual or real value includes original cost, the age of the property, its use and utility, its condition, and the cost of restoration or replacement. *Id.*

■ There was no record evidence about the market value of the bridge before its destruction. Given the nature of the property destroyed, any such evidence would have been speculative at best. We therefore reject Vlotho's claim that such evidence was necessary. Here actual or real value is the proper measure of damages for the loss of the bridge.

■ There was evidence about the bridge's original cost, age, use, condition, and utility. There was also expert testimony on replacement or restoration cost. The record amply supports the district court's ultimate award of $115,600 under the actual or real value approach.

B. *Aesthetic and historical significance value.* In its cross-appeal the county complains because it thinks the district court did not allow additional damages for aesthetic and historical significance value.

■ The district court certainly could consider such factors under the actual or real value method of valuation. *See Bangert v. Osceola County,* 456 N.W.2d 183, 190 (Iowa 1990). In its posttrial order in this case, the district court, at the county's request, increased the compensatory damages award from $50,000 to $115,600. The court expressly found that the $115,600 "adequately compensates the county for the aesthetic and historical loss." Contrary to the county's assertion, the district court did consider

aesthetic and historical significance value and allowed damages for them.

## VI. *Disposition.*

The clerk was without jurisdiction to enter the default on the counterclaim. The default was therefore void and without effect. The district court properly allowed Vlotho to contest the counterclaim.

An unresolved fact question remains on whether Vlotho's actions in tearing down the bridge were within the scope of his employment. We reverse and remand to allow the district court to make such determination on the record already made. If the district court finds that such actions were within the scope of Vlotho's employment, he is entitled to indemnification from the county against the $115,600 judgment against him. If the district court finds that such actions fall outside the scope of Vlotho's employment, the $115,600 judgment stands because indemnification is not available to him.

The district court applied the proper standard for punitive damages when it determined the county was not entitled to such damages against Vlotho. So we affirm the district court's determination on this issue.

There was substantial evidence to support the district court's award to the county for compensatory damages under the actual or real value measure of damages. So we likewise affirm the district court's determination on this issue.

Finally, the district court did award damages for aesthetic and historical significance value under the actual or real value measure of damages. So we also affirm the district court's determination on this issue.

**AFFIRMED IN PART AND REVERSED IN PART ON THE APPEAL; AFFIRMED ON THE CROSS-APPEAL.**