# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-2346
_____

Patrick M. Kearns; Jeffery Dettbarn

*Plaintiffs - Appellants*

v.

United States of America

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Southern District of Iowa - Eastern
_____

Submitted: September 23, 2021
Filed: January 18, 2022
_____

Before LOKEN, COLLOTON, and BENTON, Circuit Judges.
_____

BENTON, Circuit Judge.

Plaintiffs Patrick M. Kearns and Jeffrey Dettbarn sued for various torts in Iowa state court against Dr. David Rideout, a radiologist at the Veterans Health Administration's Medical Center in Iowa City, Iowa. The United States of America removed the case to federal court under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80. The government moved for substitution as defendant. Plaintiffs

opposed the motion. After limited discovery and briefing, the district court[1] substituted the United States for Rideout as defendant, and later dismissed the case. Plaintiffs appeal the district court's order granting substitution of defendants. Having jurisdiction under 28 U.S.C. § 1291, this Court affirms.

I.

David Rideout is a doctor and radiologist at the Medical Center in Iowa City, Iowa, a hospital within the Veterans Health Administration (VHA). Jeffrey Dettbarn, a radiological technologist at the Medical Center, worked with Rideout. Patrick Kearns, a registered nurse, was the president of Dettbarn's union. In 2017, Dettbarn repeatedly refused to follow Rideout's oral instructions about patient care, including instructions about how to position a patient, an initial request for help addressing a patient's allergic reaction, and how to use patient forms to expedite treatment. Rideout viewed these instructions as within clinical treatment guidelines and hospital protocol. Dettbarn asserted these oral instructions deviated from protocol, which required a written order before he could comply, so he was not allowed to follow them under hospital policy until Rideout provided the written order. Around mid-June 2017, Rideout complained to a representative of Dettbarn's union, who involved Kearns. Rideout then elevated his concerns to the Medical Center's ethicist and higher-level managers.

In mid-July 2017, Medical Center leadership addressed whether Dettbarn could refuse to follow instructions related to patient care. Rideout then reported his concerns about how Dettbarn's behavior affected patient treatment to the Iowa Department of Public Health, and the national licensing body for radiological technologists. He similarly reported Kearns to the Iowa Board of Nursing. Rideout also reported his concerns to the VA's executive officer for patient safety, and to a

---

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

staffer for U.S. Senator Charles Grassley. In these communications, Rideout focused on how Dettbarn's and Kearns's behavior affected clinical patient treatment.

Kearns and Dettbarn then sued Rideout in Iowa state court for various torts, including defamation, and interference with a business relationship. The government removed the case to federal court. It then moved to substitute itself for Rideout, certifying that Rideout's conduct fell within the scope of his employment. After discovery and briefing, the district court reviewed the submitted evidence, concluded that an evidentiary hearing was unnecessary, ruled that Rideout acted within the scope of his employment, and substituted the government. The government later filed a motion to dismiss, which the court granted.

Kearns and Dettbarn appeal the district court's order substituting the government for Rideout. This Court reviews de novo the district court's order granting substitution of the government. **Wilcox v. United States, 881 F.3d 667, 671 (8th Cir. 2018)**.

## II.

The Federal Tort Claims Act ("FTCA") provides the exclusive remedy for any injury "arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." **28 U.S.C. § 2679(b)**. In an FTCA suit, "the United States shall be substituted as the party defendant" "[u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose." **Id. § 2679(d)(1)**.

This certification, however, does not "conclusively establish that the United States should be substituted as party defendant." **Heuton v. Anderson, 75 F.3d 357, 360 (8th Cir. 1996); Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 434 (1995)**. If a plaintiff challenges the certification, "the district court must determine whether the defendant was acting within the scope of his employment when the conduct in

question occurred." ***Heuton*, 75 F.3d at 360**. The plaintiff "bears the burden of coming forward with specific facts rebutting the certification." ***Lawson v. United States*, 103 F.3d 59, 60 (8th Cir. 1996)**. "An evidentiary hearing should be held if there are material fact issues in dispute" regarding the scope of employment. ***McAdams v. Reno*, 64 F.3d 1137, 1145 (8th Cir. 1995)**. ***See Brown v. Armstrong*, 949 F.2d 1007, 1012 (8th Cir. 1991)** (requiring disputes be resolved "as soon after the motion for substitution as practicable, even if an evidentiary hearing is needed to resolve relevant fact disputes").

To assess whether material facts exist, a court should apply the genuine-issue-of-material-fact standard used at summary judgment, interpreting the evidence in the light most favorable to the party opposing substitution. ***See, e.g.*, *United States v. Hirani*, 824 F.3d 741, 746 (8th Cir. 2016)** (stating summary judgment standard). If an issue of material fact exists, the court should conduct an evidentiary hearing. ***McAdams*, 64 F.3d at 1145**. This is because briefing and evidence about a contested substitution is akin to summary judgment: just as the court would deny the summary judgment motion if a genuine issue of material fact exists and proceed to trial, the court here should proceed to an evidentiary hearing, where the court takes the role of fact-finder to resolve those issues of material fact. ***See Brown*, 949 F.2d at 1011-12** (stating FTCA substitution process sought to undue a Supreme Court decision and "return Federal employees" to the system in which "questions of official immunity were resolved through a summary judgment or dismissal early in the case" but requiring a hearing to resolve fact disputes (quotations omitted)); ***Taboas v. Mlynczak*, 149 F.3d 576, 581 (7th Cir. 1998)** (stating substitution motion may be decided "akin to a summary judgment motion" on "affidavits and other evidence" "if the movant contests the facts as pled and the plaintiff is *unable* to demonstrate that a genuine issue of material fact exists with respect to the scope of employment" (emphasis added)). ***Cf. Melo v. Hafer*, 13 F.3d 736, 747 (3d Cir. 1994)** (holding 28 U.S.C. § 2679(d)(3)—which states a federal employee may "petition the court to find and certify that the employee was acting within the scope of his office or employment"—means that a court should "conduct an evidentiary hearing and make

-4-

all findings necessary" to determine the scope of employment when material facts are disputed).

Where there is an issue of material fact, conducting an evidentiary hearing is critical. If a plaintiff's claims are intentional torts barred by the FTCA, as some are here, then substitution and the government's FTCA defenses doom the plaintiff's claims. *See de Martinez***, 515 U.S. at 427; 28 U.S.C. § 2680(h)**.

Finally, "[i]f the court finds that the employee was acting outside of the scope of his employment, the court must refuse to substitute the United States." *Heuton***, 75 F.3d at 360**.

The law of the place in which the alleged tortious act occurred determines whether the defendant was acting within the scope of employment. *Id.***;** *Brown***, 949 F.2d at 1012 n.7**. Iowa law governs here because all alleged acts occurred within its borders.

Under Iowa law, for an act to fall within the scope of employment, the act "must be of the same general nature as that authorized or incidental to the conduct authorized." *Godar v. Edwards***, 588 N.W.2d 701, 705 (Iowa 1999),** *quoting Sandman v. Hagan***, 154 N.W.2d 113, 117 (Iowa 1967)**. An act falls outside the scope of employment only where it is a substantial deviation from the employer's business or interest. *Godar***, 588 N.W.2d at 706;** *Sandman***, 154 N.W.2d at 117**. In addition, "conduct 'in excess of the powers actually conferred on the servant' may fall within the scope of . . . employment if the 'act is necessary to accomplish the purpose of the employment and is intended for such purpose.'" *Heuton***, 75 F.3d at 361,** *quoting Sandman***, 154 N.W.2d at 117;** *Godar***, 588 N.W.2d at 705**.

In assessing whether conduct falls within the scope of employment, Iowa courts have considered various aspects of the conduct, including: whether it was authorized, whether it was foreseeable, when and where it occurred, and the employee's purpose in committing it. *See Godar***, 588 N.W.2d at 706-07** (finding

acts outside scope of employment where "there was no evidence" that the employee's "conduct was expected, foreseeable, or sanctioned" by his employer, and was not "in furtherance of his duties," even though conduct occurred on employer's property); ***Vlotho v. Hardin Cnty.*, 509 N.W.2d 350, 354-55 (Iowa 1993)** (assessing conduct's authorization, time, purpose, foreseeability, and departure from past practice). The Iowa Supreme Court also has listed similar factors from Section 229(2) of the Restatement (Second) of Agency "to be considered in determining whether conduct of an employee [falls] within the scope of . . . employment," although it has not mechanically tallied these factors. ***Godar*, 588 N.W.2d at 706.** ***See also*** ***Vlotho*, 509 N.W.2d at 354** (citing Restatement (Second) of Agency § 229). Ultimately, the scope-of-employment test is a "fact-intensive analysis." ***Riggan v. Glass*, 734 N.W.2d 486 at \*3 (Iowa Ct. App. 2007)** (unpublished table opinion). ***See* Restatement (Second) of Agency § 229 cmt. a (Am. L. Inst. 1958)** ("The limits of the scope of employment are dependent upon the facts of the particular case . . . ."). ***See also Vlotho*, 509 N.W.2d at 355** (recognizing some facts supported conclusion that employee acted within his scope of employment, while others supported the opposite conclusion).

Under the Iowa Supreme Court's "same general nature" and "substantial deviation" rules, Rideout's conduct fell within the scope of his employment. Most aspects of Rideout's conduct suggest he acted within his scope of employment. Only one aspect—his purpose—arguably could favor the opposite finding but, even if it did, this alone would not outweigh the other relevant aspects of his conduct.

First, the VHA, Rideout's employer, largely authorized his conduct. Rideout first contacted supervisors and management within the Medical Center about his concerns on June 14, 2017. ***See* 6/14/17 Email at 3, DCD 21-1**. Plaintiffs do not dispute that these contacts were authorized. ***See* Kearns Br. at 25** (challenging conduct after June 14, 2017).

Rideout's subsequent contact with external entities largely remained within the VA's normal, authorized, expected processes. The VHA whistleblower policy

identifies a whistleblower as an employee "who reasonably believes that VHA has engaged in conduct that . . . violates professional or clinical standards; or that the care, services, or conditions provided by VHA potentially endangers one or more patients . . . ." **VHA Privacy Fact Sheet at 15, DCD 22**. The policy authorizes whistleblowers to disclose "sensitive personal information" to specific entities, including (1) "[a] public health authority authorized by law" to oversee VHA conditions, "such as state licensing boards," (2) Congressional committees and subcommittees "authorized by law" to oversee the VHA, and (3) "[a]n appropriate health care accreditation organization . . . for the purpose of reporting the allegation of failure to meet professional standards or misconduct by VHA." *Id.* The policy summary states that whistleblowers "may disclose to the media, a veterans' service organization, or an attorney de-identified information," which is information that would not be sufficient to identify a specific patient, *id.* **at 14**. It also elaborates in the frequently asked questions section: "A whistleblower may disclose health information de-identified in accordance with the HIPAA Privacy Rule and VHA Directive 1605.01 Appendix A without following the requirements discussed above," apparently referencing the limitations on disclosure of sensitive personal information, *id.* **at 16**. *See also* **VHA Directive 1605.01 App. A. at A-1 to A-2 (Aug. 31, 2016)** (providing standards for de-identified information); **45 C.F.R. § 164.514(a) (2021)** (defining de-identified information). Rideout contacted the relevant credentialing boards for Dettbarn and Kearns. *See* **7/31/17 Am. Registry of Radiological Techs. Letter at 2, DCD 21-6** (acknowledging receipt of Rideout's letter alleging a violation of standards by Dettbarn); **8/27/19 Email at 2-11, DCD 21-7** (stating, to Iowa Department of Health official, that information "is the same letter preparing [sic] for ARRT" and detailing allegations against Dettbarn); **Rideout Dep. at 65:18-21, DCD 22** (confirming Rideout "filed a complaint with the Iowa Board of Nursing against" Kearns). These contacts fall squarely within those authorized by the whistleblower policy for sensitive personal information.

Rideout's other external contacts form at most minor departures from the whistleblower policy. Rideout contacted the Iowa Department of Public Health ("IDPH"), which Plaintiffs assert lacked authority over the hospital. *See* **8/27/19**

**Email at 2-11, DCD 21-7** (emailing IDPH official about Dettbarn); **Kearns Br. at 31**. Rideout also contacted a staffer for Charles Grassley, U.S. Senator for Iowa, who did not serve in the oversight roles permitted by the VHA whistleblower policy, but did serve on the Senate Finance Committee's Health Committee. *See* **7/21/17 Email at 12-24, DCD 7-2** (contacting staffer about Kearns and Dettbarn). In both instances, the record reflects that Rideout disclosed only anonymized patient information not subject to the rigorous controls of the whistleblower policy. *See id.* **at 18, 23** (detailing situations in which Dettbarn allegedly endangered patient welfare by not following instructions, but not providing any information about the patient beyond the situation); **8/27/19 Email at 4-5, DCD 21-7** (same). As a result, Rideout was not prohibited from contacting the Iowa Department of Health or Senator Grassley's staffer. Because the whistleblower policy authorized disclosing sensitive information to a "public health authority" or congressional committee with applicable oversight authority and also authorized broader dissemination of de-identified information, Rideout's disclosure of anonymized information to Iowa-related entities responsible for healthcare oversight is not a significant departure, if any, from the normal method of protecting patient safety.

Responses from VHA management reinforce the normalcy of Rideout's conduct. As one high-ranking manager in the Radiology Department, Dr. Stanley L. Parker, summarized, "The VA has whistleblower protection, so anyone is allowed to file a complaint with any legal authority if they feel necessary." **Parker Dep. at 17:6-16, DCD 22.** *See id.* **at 3:2-17** (identifying Parker's roles); **Dettbarn Suppl. Decl. ¶ 1, DCD 21-21** (same). Similarly, when one supervisor, Dr. David L. Bushnell, asked Rideout to address concerns only to himself or another supervisor, Rideout implied Bushnell was "discourag[ing] reporting" of the issues. **6/20/17 Email at 2, DCD 21-2**. In response, Bushnell acknowledged that Rideout "ha[d] the right" to report the problems he saw. *Id.* Another time, Rideout informed hospital management that he had notified the Iowa Department of Health. *See* **8/27/19 Email at 7, DCD 21-9** (forwarding 7/16/17 email to management). In response, they did not admonish him or suggest he had violated VHA policy. Instead, Bushnell responded by asking him to "document in real time" future issues

that arose with radiological technologists and bring them to management, **7/17/17 Email at 2, DCD 21-20**, and another official directed him to bring concerns to a different official, **7/24/17 Email at 10, DCD 7-2** (suggesting Rideout speak with "Robin Hemphill"). These responses confirm that Rideout's behavior did not depart much, if at all, from what the VHA authorized.

Second, the VHA had strong reason to foresee conduct like Rideout's. The VHA authorized whistleblowing to protect patient safety. It had every reason to expect that employees would, in fact, blow the whistle on issues they viewed as endangering patients. Further, the fact that Rideout's supervisors expressed no surprise when he informed them that he had alerted the Iowa Department of Health reinforces that his conduct did not depart from expectations.

Third, the time and place of Rideout's conduct also places it within the scope of his employment. Plaintiffs acknowledge that Rideout's conduct, including "all material events," "occurred at the VA Hospital," and do not argue the place or time of his acts occurred outside his work hours.

Most aspects of Rideout's conduct strongly support the conclusion that Rideout acted within his scope of employment. Rideout acted with authorization under VHA policy and approval from his superiors. The VHA's policies made his conduct foreseeable. All relevant conduct occurred at the workplace, during business hours. These aspects suggest that Rideout's conduct fell within and did not substantially deviate from his scope of employment. The evidence for these aspects consists of VHA policy and contemporaneous correspondence between Rideout, his supervisors, and oversight entities. The evidence does not depend on Rideout's credibility.

The parties, however, contest the purpose of Rideout's acts. Much of the record suggests Rideout's intent was to serve the VHA, further placing his conduct within his scope of employment. Patient welfare is a clear purpose of the VHA. *See* **VHA Privacy Fact Sheet at 15, DCD 22** (authorizing whistleblowing about

conduct that "potentially endangers" patients); **6/16/17 Bushnell Email at 3, DCD 21-2** (recognizing concerns about misconduct affecting patients as "serious matters"). Rideout consistently stated that his concern was how Dettbarn's and Kearns's behavior affected patient wellbeing. *See* **6/14/17 Email at 3, DCD 21-2** ("My only concern is our patients and my ability to practice medicine."); **7/15/27 Email at 4, DCD 21-7** (discussing Dettbarn's "disregard for patient health" when responding to an allergic reaction); **6/16/17 Email at 2, DCD 21-9** (stating concern that the environment was "creating an unsafe situation").

Plaintiffs, on the other hand, argue that Rideout's true purpose was to retaliate against them because VHA management took a policy position that supported them rather than Rideout—namely, that radiologists had to instruct technologists in writing if they wanted to deviate from approved protocols. Plaintiffs argue that Rideout's rhetoric, the timing of his actions, and subsequent contradictions in his testimony underscore this true motive.

This argument fails because Rideout's purpose, without more, does not render his acts a substantial deviation from his scope of employment. Purpose is but one of many aspects that Iowa courts consider in assessing scope of employment. *See* *Godar*, **588 N.W.2d at 706** (listing the "purpose of the act" as an aspect for consideration); *Riggan*, **734 N.W.2d 486 at \*4** (concluding sufficient evidence supported finding that acts were within scope of employment where only one aspect supported a contrary finding). *See also Brown*, **949 F.2d at 1012** (finding "conclusory allegations of bad or personal motive" were insufficient to take conduct outside scope of employment where complaint otherwise pleaded conduct within it).

Indeed, Iowa precedent provides no rule that if an employee's reason for committing an act is not the "purpose of employment," *Heuton*, **75 F.3d at 361**, then the act automatically falls outside the scope of employment. Rather, "conduct 'in excess of the powers actually conferred on the servant' *may* fall within the scope of the employee's employment if the 'act is necessary to accomplish the purpose of the employment and is intended for such purpose.'" *Id.*, *quoting Sandman*, **154 N.W.2d**

**at 117** (emphasis added). This means that an employee's intent to accomplish the purpose of employment is one way to keep unauthorized conduct within that employee's scope of employment (assuming the act also was required to accomplish that purpose). Intent represents a sufficient but not necessary cause of an act falling *within* the scope of employment.[2] ***See Jones v. Blair*, 387 N.W.2d 349, 355 (Iowa 1986)** (stating that "[a]n employee acts *within* the scope of his employment when the employer has the right to direct the means and manner of doing work, and has the right of control over the employee" (emphasis added)); ***Heuton*, 75 F.3d at 361** (holding that conduct could fall within scope of employment under either *Jones*'s right-of-control test or *Sandman*'s intent-and-necessity test).

Thus, intent by itself becomes dispositive only where no other sufficient cause is available to render an employee's *unauthorized* conduct within the scope of employment. ***See id.*** (requiring—where demeaning photograph depicted employee plaintiffs as mother pig and suckling piglets, posting the photograph was "improper," and "all the evidence in the record indicate[d] that posting [it] was unquestionably prohibited by" the employer—a "subjective inquiry into the . . . intent" of plaintiffs' employee supervisor, assuming he had posted the photograph); ***Vlotho*, 509 N.W.2d at 355** (concluding that, where employee "exceeded his authority" and demolished bridge "under stealth," a "court could find that [his] actions were not intended to advance the interests" of his employer). ***See also Heuton*, 75 F.3d at 361** ("Determining whether *unauthorized conduct* falls within

---

[2]As *Heuton*'s use of the permissive "may" suggests, the further wrinkle in this rule is that even if an employee commits an act necessary to accomplish the purpose of employment and has the intent to accomplish that purpose when committing the act, sometimes the act *still* will not fall within the scope of employment. Sometimes intent is not even sufficient. Thus, the rule effectively boils down to a description of one possible scenario of how the various factors weigh. This may be why the Iowa Supreme Court, in a post-*Heuton* ruling, framed the rule as synonymous with the general "substantial deviation" test. ***See Godar*, 588 N.W.2d at 705-06** (stating intent rule, and immediately continuing, "The question, therefore, is whether the employee's conduct 'is so unlike that authorized that it is substantially different" (*quoting Sandman*, 154 N.W.2d at 117)).

the scope of employment, therefore, involves a subjective inquiry into the employee's intent." (emphasis added)); *Godar*, **588 N.W.2d at 706-07** (finding school district employee's sexual molestation of student "cannot be reasonably said [to be] authorized by the school district" and then concluding his conduct was not "committed in furtherance of his duties"); *Sandman*, **154 N.W.2d at 118** (finding employee who attacked coworker with a shovel was not acting within scope of employment because, among other things, "[i]t is difficult to see how his [public works] employer's business or interest would ever be furthered by such an employee attack"). Here, Rideout's intent is not material, let alone dispositive, because the other aspects of his conduct squarely place it within his scope of employment.[3]

Even if purpose were dispositive, Plaintiffs would have to prove Rideout had no intent to benefit the VHA because conduct that serves "the purposes of the servant" may remain "within the scope of employment." **Restatement (Second) Agency § 236;** *see also id.* **cmt. a** (stating that this rule includes when a servant "although performing his employer's work, is [also] accomplishing his own objects"); *Crowe v. De Soto Consol. Sch. Dist.*, **68 N.W.2d 63, 66 (Iowa 1955)** (finding, in worker's compensation case, that teacher was within scope of

---

[3]If Rideout's intent had been material or dispositive to his scope of employment, then an evidentiary hearing would have been required to the extent that Plaintiffs' evidence—including circumstantial evidence—established an issue of material fact. *See McAdams*, **64 F.3d at 1145** (requiring an evidentiary hearing to resolve "material fact issues in dispute" for substitution of the government); *Brown*, **949 F.2d at 1012**; *Heuton*, **75 F.3d at 361** (vacating and remanding substitution decision where district court failed "to determine all the facts relevant" to scope of employment issue); *Larsen v. Frederiksen*, **277 F.3d 1040, 1041 (8th Cir. 2002)** (stating a plaintiff challenging the scope-of-employment certification "bears the burden of coming forward with specific facts rebutting the certification" (quoting *Lawson*, 103 F.3d at 60)); *Hirani*, **824 F.3d at 747** ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." (quoting *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003))); *Hirani*, **824 F.3d at 747** (concluding circumstantial evidence is "just as probative as direct evidence" to show willfulness in denaturalization proceeding).

employment where she "was not on a mission solely for her own benefit," despite a partly personal motive).

Because Rideout's intent is not material, and all other evidence shows Rideout acted within his scope of employment, an evidentiary hearing is not warranted.

* * * * * * *

The order granting substitution is affirmed.

_____